IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FREDERICK REICH,** | : | **CIVIL ACTION NO. 1:13-CV-2591** |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| v. | : | |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,** | : | |
| **Defendant** | : | |

## **MEMORANDUM**

### **Introduction**

Plaintiff Frederick Reich has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured." Reich met the insured status requirements of the Social Security Act through December 31, 2013. Tr. 13.[1] Thus, Reich must establish that he suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A).

Reich filed his application for disability insurance benefits on April 5, 2011, alleging that he became disabled on December 27, 2007. Tr. 83. He has been diagnosed with several impairments, including: status post myocardial infarction, right and left carotid endarterectomy, history of peripheral vascular disease,

---

[1] References to "Tr.\_" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

ischemic disease, acute renal failure, hypertension, and hyperlipidemia. Tr. 13, 296. On August 25, 2011, Reich's application was initially denied by the Bureau of Disability Determination. Tr. 11.

A hearing was conducted by an administrative law judge ("ALJ") on June 15, 2012, where Reich was represented by counsel. Tr. 23-52. On July 27, 2012, the ALJ issued a decision denying Reich's application. Tr. 11-17. On August 26, 2013, the Appeals Council declined to grant review. Tr. 1. Reich filed a complaint before this Court on October 18, 2013, and this case became ripe for disposition on March 21, 2014, when Reich declined to file a reply brief.

Reich appeals the determination on the sole ground that the ALJ failed to afford Reich a full and fair hearing. For the reasons set forth below, this case is remanded to the Commissioner for further proceedings.

**Statement of Relevant Facts**

Reich was sixty years of age at the time the ALJ rendered his decision; he has a high school education and is able to read, write, speak, and understand the English language. Tr. 83, 101, 103. Reich has past relevant work experience as a court clerk, which is classified as sedentary, skilled work, though the job's exertional level was medium as actually performed by Reich. Tr. 36-37, 41.

A.   **Reich's Physical Impairments**

In 1993, Reich underwent bifemoral aortic bypass surgery to treat peripheral vascular disease, and in 1998 he underwent stenting and angioplasties for coronary disease. Tr. 285. In the year 2000, Reich suffered from a myocardial infarction, and in 2004 he suffered from a transient ischemic attack. Tr. 285, 286.

On November 4, 2010, Reich presented to the hospital after "noticing some palpitation awareness." Tr. 291. Reich denied lightheadedness, dizziness, shortness of breath, or chest discomfort. Id. There was no evidence of paroxysmal nocturnal dyspnea,[2] orthopnea,[3] pedal edema, heart murmurs, or rheumatic fever. Tr. 292. His blood pressure was 108/58, his heart rate was 58, and oximetry was 95% on room air. Id. Reich's peripheral pulses were intact, and there was no clubbing or cyanosis in the extremities. Id.

Reich was assessed with cardiovascular disease with no symptoms of congestive heart failure, "peripheral vascular disease with bypass bilaterally femoral," moderate carotid artery disease on the right, hypertension, hyperlipidemia, and "acute renal failure[.]"[4] Tr. 294, 296. An echocardiogram revealed no significant aortic valve gradient, no aortic regurgitation, and only trace mitral regurgitation. Tr. 298.

---

[2] Paroxysmal nocturnal dyspnea is a shortness of breath that awakens an individual from sleep; this condition "is very often a sign of significant heart failure[.]" Richard N. Fogoros, M.D., heartdisease.about.com, Paroxysmal Nocturnal Dyspnea, *available at* http://heartdisease.about.com/od/ lesscommonheartproblems/g/Paroxysmal-Nocturnal-Dyspnea-Pnd.htm (last visited October 30, 2014).

[3] Orthopnea is a shortness of breath that occurs when an individual is lying down; this condition "is often a sign of heart failure[.]" Richard N. Fogoros, M.D., heartdisease.about.com, orthopnea, *available at* http://heartdisease.about.com/od/ lesscommonheartproblems/g/Paroxysmal-Nocturnal-Dyspnea-Pnd.htm (last visited October 30, 2014).

[4] Acute kidney failure symptoms may include, *inter alia*, drowsiness, fatigue, and confusion. Mayoclinic.org, Acute Kidney Failure Symptoms, *available at* http://www.mayoclinic.org/diseases-conditions/kidney-failure/basics/symptoms/con-20024029 (last visited October 29, 2014).

On November 18, 2010, Reich presented to Walter Kaufmann, M.D. with "severe carotid stenosis on the right." Tr. 285. Dr. Kaufmann noted that Reich "does get about reasonably well without feeling short of breath or chest discomfort at this time." Id. A physical inspection revealed no heart murmurs and no evidence of paroxysmal nocturnal dyspnea or orthopnea. Id. Reich was compliant with numerous medications, including Aspirin, Tenormin, Vasotec, Lipitor, Plavix, and Vitamin D. Tr. 286. Dr. Kaufmann diagnosed Reich with "[p]rogressing carotid stenosis on the right," "stable coronary artery disease as far as shortness of breath, chest discomfort, [or] palpitations," a history of myocardial infarction, hyperlipidemia, and hypertension. Id.

Later that day, Daniel Wolff, M.D. conducted a stress test and EKG. Tr. 275-78. "Exercise SPECT images demonstrate[d] a moderate zone of severely decreased uptake involving the inferior and inferoposterior segment." Tr. 275. The "abnormal" and "submaximal" study also revealed a "moderate zone of inferoposterior wall infarction [with no] definite ischemia noted." Id. During the stress test, Reich's maximum blood pressure reached 160/80, his maximum heart rate reached 115 beats per minute, and his maximum METS was 9.7. Tr. 277. The test was not completed due to leg cramps and pelvic discomfort. Id. The EKG revealed "nondiagnostic Qs in the inferior lateral lead" and 99% resting oximetry on room air. Id. Reich was diagnosed with cardiac dysrhythmia[5] and coronary artery disease. Tr. 275.

---

[5] This is a disturbance in the heart's natural rhythm. See, Dorland's Illustrated Medical Dictionary, 582 (32nd Ed. 2012).

On February 8, 2011, Reich underwent right carotid endarterectomy surgery. Tr. 177-78. Romeo Mateo, M.D. noted that Reich had been suffering from progressive, worsening right internal carotid stenosis of eighty to ninety percent. Id. The narrowing was confirmed by ultrasound as well as a CT angiography. Tr. 177. Reich tolerated the procedure well and, upon discharge, he was instructed not to lift, push, or pull anything weighing more than eight pounds. Tr. 165, 168. He was limited from driving, sexual activity, or work, and was told to avoid strenuous exercise until he discussed this with his surgeon at the first post-operative appointment. Tr. 165-66. Gradual walking was encouraged, but Reich was reminded to "listen to [his] body and rest when needed." Tr. 165.

On July 12, 2011, Reich underwent a consultative examination with Barry Kurtzer, M.D. Tr. 266-68. Reich complained that his previous surgeries and procedures had left him "very weak and dizzy and unable to work." Tr. 266. His past medical history was significant for hypertension, hyperlipidemia, coronary artery disease, a myocardial infarction, ministrokes, left and right carotid endarterectomy, "aorto-fem-pop bypass," and multiple stents in the heart. Id. Reich was in no acute distress, was able to "get on and off the exam table without difficulty," and had a regular heart rhythm. Tr. 267. There were no heart murmurs, gallops, or rubs present, and no clubbing, cyanosis, or edema was present in the extremities. Id. Reich's gait was non-antalgic and he had good motor strength in his extremities. Id.

B.   **The Administrative Hearing**

Prior to taking any testimony from Reich, Nadine Henses, an impartial vocational expert, was called to give testimony. Tr. 36. The ALJ asked Ms. Henses to assume that Reich were limited light work[6] and could occasionally use ramps or stairs, but never climb ladders, ropes or scaffolds. Tr. 37. He could occasionally balance, stoop, kneel, crouch, or crawl. Id. He must avoid temperature extremes, humidity, or concentrated exposure to vibrations, pulmonary irritant, or hazards. Id. Ms. Henses opined that, given these restrictions, Reich would be able to perform his past relevant work. Id.

Thereafter, the ALJ allowed Reich to briefly testify. Tr. 46. The entirety of Reich's testimony is as follows:

**Examination of Claimant by Claimant's Attorney**

Q  Now, Frederick, you've had multiple surgeries; what are the resulting --

**Examination of Claimant by Administrative Law Judge**

Q  Total of how many procedures?

A  I'd say five, six.

Q  Okay. In the last four years, how many procedures? You had the one in February 2011, what before that?

---

[6] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

A That's the only procedure --

Q In the past four years?

A That's correct.

Q Okay, all right.

ALJ: Because you're going back to 2007 as the onset, here counsel, and so well, five years. Why is December 2007 the onset here?

ATTY: That's when you stopped working; correct?

CLMT: Yeah --

ALJ: December 27 --

CLMT: I mean, I was just totally fatigued. I constantly think I can't do it no more so --

Q So that's when you say your symptoms were so prevalent and so significant that they would preclude you from performing at work?

A I think --

Q Now, the credibility factor's pretty high here, but you got $72,000 worth of earnings in 2008, so how could I go back to 2007?

A 72 -- I didn't follow that.

Q Okay, according to the exhibit --

ALJ: Counsel, I'm referencing --

ATTY: Yeah, it won't come up.

ALJ: Exhibit 2D. 2008 -- $72,329.39.

ATTY: Well, the code went in, it just won't come up.

HM: It won't come up.

ALJ: I'm sorry, what happened?

7

ATTY:  I can't access the --

ALJ:  Well, you can approach the bench if you want, if you need to see it --

ATTY:  That's okay, I trust you.

ALJ:  -- but I mean, I'll put it this way; here are the dollar values. $90,000 in 2005, $94,000 in 2000 -- you need this kind of income to live in New York, by the way. $90,000 in 2005, $94,200 in 2006, $92,062.70 in 2007, and $72,329.39 in 2008.

Q  By the way, did you retire, or did you --

A  I retired.

Q  So you --

A  I put in over 30 years.

Q  Okay, so you were able to retire fully from that job?

A  Yes.

Q  So in -- the last day you worked was when in 2000?

A  December 27, 2007

Q  Well, then where's the $72,000 coming from in 2008? Did you take short-term disability?

A  No, that's my pension.

Q  That was your pension?

A  Yeah.

Q  How could you only report one period of pension? This report was run --

ATTY:  Yeah, it shows earnings --

ALJ:  -- in March of 2012. Yeah, they show earnings not pension.

**Examination of Claimant by Claimant's Attorney**

Q In 2008, did you have accumulated time, did you --

A Oh yeah, they paid me my overtime and you know, whatever sick leave credit I had, annual leave credits, it was all combined.

**Examination of Claimant by Administrative Law Judge**

Q Okay, and you took retirement?

A Yeah, I retired.

Q After how many years were you there?

A 30 some odd years.

Q Okay. 30 some odd years; so you were eligible for full retirement and you took the retirement then?

A I did.

Q Okay. Now, according to this, you filed in April of 2011. If you stopped working in December of 2007, why'd you wait four years to file; or three and a half?

A Because I just kept getting constantly fatigued over the years.

Q Okay.

A It comes to the point now, I've got to take a nap every day.

Q Okay, well -- here's what I'm asking you; if you were disabled from working as of December of 2007, because that's where you're alleging your onset is -- you didn't file for disability until 2011, and the question becomes why that many years of gap? Because here's -- I mean --

A I'm not saying that was the exact date.

Q But are you under early Social Security retirement, at all?

A Am I under Social Security retirement?

Q Yeah, are you taking an early Social Security retirement?

9

A  I'm not getting anything from Social Security.

Q  Okay. All right, so you're still under your pension?

ATTY:  He's not eligible --

ALJ:  I'm sorry?

ATTY:  He's not eligible --

ALJ:  Okay, right 62, right?

CLMT:  62.

Q  So you got to wait two years; is that correct?

A  That's correct.

Q  Unless you've got something more for me to go on medically, I have to make a decision on medical impairment issues, and testimony is not going to get me there, because if we paid -- if we decided cases on testimony alone, I wouldn't wait -- there would be no reason for post-hearing development. I wouldn't wait for evidence. I'd just call everyone in, and I'd probably do you know 15 minute hearings, let you do the talking, ask the questions, get the testimony -- I'd be done. Now, would we be the [Greece] of the western hemisphere; yeah probably, but you know -- I can't make a decision based on no adverse findings in the records. You had one procedure according to the records. Prior procedures you had before that was in 2000 what?

A  I've had many procedures.

Q  No, in -- okay, I understand --

A  Prior to that?

Q  Yeah, but you were also working through most -- after that.

A  Life goes by. I mean, you just don't stop.

Q  Yeah, but the point is, if you told me, if you said the disabling feature that puts me at disability was a motor vehicle accident in 1995, but you worked from '95 to 2010, that's you know, 15 years [sic] worth of employment afterwards. I would ask what happened in 2010 that was monumentally different. And you've had these procedures, and went back to work. One

10

of the cardinal principles that I keep getting back, and I'm surprised sometimes, I get the medical interrogatories back from the doctors, and they say no limitations. The cardiac issue is resolved with treatment. Now, if I can't find adverse findings, I'm not going to be able to go anywhere with it. If I -- I'm guaranteeing you, based on this record, if I sent it out to a medical interrogatory, they're going to come back and say no limitations, they're going to. [INAUDIBLE] there's not enough information.

ATTY: Right, we need to get that --

ALJ: Well, if you can get it for me, I can start looking at it otherwise, because based on the present information, I'm not going to be able to render a decision that's remarkably any different --

ATTY: Okay.

ALJ: -- than the state agency determination. Okay?

ATTY: Fair enough.

ALJ: Ms. Henses, as I asked you before, the testimony you presented today, has it been consistent with the Dictionary of Occupational Titles?

VE: Yes.

ALJ: All right, thank you. That's it, sorry, but that's where the case is. If you can get more medical information I can maybe have a medical expert react to that.

ATTY: Okay.

(The hearing concluded at 11:52 a.m. on June 15, 2012.)

Tr. 46-51.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). The district court has plenary review of all legal issues. Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person

with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

> A. **Reich's Due Process Rights**

Reich's sole argument on appeal is that the ALJ violated his right to a full and fair hearing. Specifically, Reich argues that the ALJ erred in failing to allow Reich to fully testify at the hearing.

The United States Supreme Court has stated that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976). A claimant's interest in social security benefits "is a property right under the fifth amendment's due process clause." Mattern v. Mathews, 582 F.2d 248, 254 (3d Cir. 1978) (citing Eldridge, 424 U.S. at 332). Thus, in social security administrative hearings, "[a]ny party to a hearing has a right to appear before the administrative law judge . . . to present evidence and to state his or her position." 20 C.F.R. § 404.950(a). Consequently, the Social Security Act requires "that a claimant receive meaningful notice and an opportunity to be heard before his [or her] claim for disability benefits can be denied." Stoner v. Sec'y of Health & Human Servs., 837 F.2d 759, 760-61 (6th Cir. 1988).

The Commissioner has acknowledged that a hearing provides the claimant "an opportunity to present additional oral testimony . . . directly to the decision-maker, [which] could affect the decision." SSR 79–19. Indeed, the Commissioner deems hearings to be of such importance that Reich was required to acknowledge that a hearing "could be especially useful in my case since the administrative law

13

judge could have an opportunity to hear an explanation as to how my impairments prevent me from working and restrict my activities." Tr. 72.

In this case, the hearing afforded to Reich fell woefully short of a full and fair hearing, and compromised his due process rights. During the period of the administrative hearing in which Reich was allowed to testify, he had to opportunity to give exactly twenty-seven responses, of which ten were one or two word replies. Tr. 46-51. Despite purporting to allow Reich's attorney, Michael Parker, Esquire, to elicit testimony from his client, the ALJ did not allow Attorney Parker to direct a single question to Reich relating to his impairments or limitations. Tr. 45-51. When Attorney Parker attempted to ask a question, the ALJ interrupted with his own line of questioning. Tr. 46.

Reich was not provided an opportunity to testify as to his physical impairments or their impact on his functional abilities. He was not given a chance to discuss how much weight he could lift or carry, how long he could stand or walk, or for how long he was able to sit. These functional abilities are critical in determining and individual's exertional limitations. See, 20 C.F.R. § 416.967. Reich was not given the opportunity to testify as to how long he could maintain an activity before becoming too fatigued to continue. Reich was able to say less than two full sentences regarding his symptoms; he testified that he was "fatigued" and had reached the point where he required "a nap every day." Tr. 46, 49.

The ALJ did not allow Reich the opportunity to explain why his medical records may not have fully expressed any actual physical limitations or symptoms that he was experiencing. He was not able to discuss the reasons why he did not

seek significant medical treatment from 2007 until 2010, a fact that the Commissioner repeatedly references in her brief as evidence that Reich was not as limited as he claimed. Prior to Reich giving any substantive testimony regarding his impairments, symptoms, or physical limitations, the ALJ cut short the hearing, stating that Reich's testimony would not allow the ALJ to reach a different conclusion than the State Agency. Tr. 50-51.

The ALJ's failure to allow testimony was particularly harmful in light of the specific facts and findings of this case. As the ALJ accurately stated, Reich's medical records did not contain significant objective findings that demonstrated disabling limitations, and no residual functional capacity assessment was contained within the administrative record that rendered Reich disabled. Tr. 15-17. Thus, the only evidence that could have been presented to established disability was Reich's own testimony as to his symptoms and functional limitations.

Contrary to the ALJ's assertion, Reich's testimony could have established disability. Tr. 50-51. Social Security regulations state that subjective complaints and symptoms alone cannot establish disability; there must be medical evidence that establishes the existence of a medically determinable impairment that could reasonably produce the alleged symptoms. Hartranft v. Apfel, 181 F.3d 358, 361 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529). Once evidence establishes such an impairment, subjective symptoms may form the basis for a finding of disability. Id. Established Third Circuit precedent on this matter is clear: once a claimant has established a medical impairment that could reasonably be expected to produce the alleged symptoms, his or her subjective complaints and testimony must be given

"great weight." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999) (citing Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979)).

Here, the ALJ determined that Reich's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" Tr. 15. Reich thereby satisfied his initial burden, and his subjective symptoms could have established disability at that point. However, Reich was never presented with an opportunity to testify as to his symptoms and limitations, and consequently was denied the opportunity to establish his claim for disability insurance benefits. Absent a full and fair opportunity to be heard and put forth any reasons, explanations, or limitations that may establish disability, it cannot be said that the administrative hearing satisfied the due process clause of the Fifth Amendment. Consequently, remand is required so that Reich may be afforded a full and fair hearing, with an opportunity to explain his case to an ALJ before any decision is rendered regarding his claim.

B.   **Absence of Support for the ALJ's Credibility Determination**

The ALJ's decision was further compromised by an improper credibility determination. Though this issue has not been raised on appeal, and therefore is not a ground for remand, the Court raises this issue so that the errors will not be repeated on remand. The ALJ found that Reich's "statement concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. 15. However, this finding was compromised in two ways.

First, the ALJ failed to evaluate all of Reich's medical diagnoses. Notably absent from the ALJ's discussion of severe and non-severe impairments was any mention of Reich's diagnosis of acute renal failure in 2010. Tr. 296. The failure to analyze all diagnoses and impairments, or provide some reason for rejecting a diagnosis as a medical determinable impairment, calls into question the ALJ's credibility determination. See, e.g., Sinker v. Colvin, No. 1:13-CV-2313, 2014 WL 4976265, at *6 (M.D. Pa. Oct. 3, 2014); Laforge v. Colvin, 1:13-CV-02219, 2014 WL 4717794, at *10 (M.D. Pa. Sept. 22, 2014). Here, the ALJ's error is particularly problematic because acute renal failure can cause symptoms such as drowsiness and fatigue, two of the main symptoms complained of by Reich.[7]

Second, the ALJ failed to account for Reich's long work history. Reich testified that he had been employed by the New York Court system for over thirty years, and records confirm employment by the State of New York during the fifteen years prior to Reich's alleged onset date. Tr. 49, 93-94. When an individual has a long and productive work history, his or her "testimony as to his [or her] capabilities is entitled to substantial credibility." Dobrowolsky, 606 F.2d at 409. While a long work history alone is not dispositive of a claimant's credibility, it is one factor that should be considered by the ALJ. Bermudez v. Colvin, No. 3:13-CV-0156, 2014 WL 4716510, at *10 (M.D. Pa. Sept. 22, 2014). Thus, the failure to account for Reich's work history, when coupled with other flaws in the ALJ's opinion, rendered

---

[7] See, Mayoclinic.org, Acute Kidney Failure Symptoms, *available at* http://www.mayoclinic.org/diseases-conditions/kidney-failure/basics/symptoms/con-20024029 (last visited October 29, 2014).

the credibility determination defective.  E.g., Carter v. Apfel, 220 F.Supp.2d 393, 400-01 (M.D. Pa. 2000).

Consequently, the ALJ's credibility determination as a whole was not supported by substantial evidence.  On remand, the ALJ must consider all of Reich's medically determinable impairments and the extent to which those impairments support his credibility.  Additionally, the ALJ must account for Reich's work history as it relates to statements as to his ability to.

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order will be entered.

      /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        November 5, 2014